<u>NOT FOR PUBLICATION</u>

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

Filed / Docketed
October 8, 2009

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **MARKLE, DAVID GENE,** | ) | **Case No. 08-10109-R** |
| | ) | **Chapter 7** |
| Debtor. | ) | |

| | | |
|---|---|---|
| | ) | |
| **MID-CONTINENT CASUALTY COMPANY** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Adv. No. 08-01034-R** |
| | ) | |
| **DAVID GENE MARKLE,** | ) | |
| | ) | |
| Defendant. | ) | |

<u>MEMORANDUM OPINION</u>

Before the Court is the Complaint of Plaintiff Mid-Continent Casualty Company ("Mid-Continent"), seeking to have the debts owed to it under a contract titled "General Application and Agreement of Indemnity - Contractors Form" (the "Indemnity Agreement") dated July 18, 2005, to which Debtor David Gene Markle ("Markle") is a signatory, declared non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B). The Court held a trial on the merits in this adversary proceeding on June 22, 23 and 25, 2009. Mid-Continent presented testimony from three witnesses: Todd Bazata, Vice-President and Manager of Surety Bond Operations for Mid-Continent; Michael Dill, Assistant Vice-President of Bond Claims for Mid-Continent; and Markle. Defendant Markle presented testimony from three witnesses: Markle; Marvin Morse, CPA, Markle's accountant; and Thomas J. O'Brien, a commercial real

estate broker.[1]  Exhibits offered by both parties were admitted into evidence by stipulation.

Upon consideration of the pleadings, the stipulations contained in the Pre-Trial Order entered on June 19, 2009 (Doc. 43), the Stipulation and Amendments to Plaintiff's Proposed Findings of Fact and Conclusions of Law filed on September 1, 2009 (Doc. 55), trial testimony of witnesses, exhibits, briefs, arguments of counsel, and applicable law, the Court finds and concludes as follows:

## I.      JURISDICTION

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(I); and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

## II.     CONTENTIONS OF THE PARTIES

Mid-Continent contended that it issued payment and performance bonds (the "Bonds") to Parking Builders, L.L.C. ("Parking Builders"), a company formed by Markle, on the basis of a variety of written financial documents describing the overall financial condition of Markle and Parking Builders.  These documents included a statement of Markle's personal financial condition and various corporate tax returns.  Mid-Continent contended that these written documents were materially false because they overstated Markle's and Parking Builders' net worth.  Specifically, Mid-Continent argued that Markle overvalued several of

---

[1] Markle designated Mr. O'Brien as an expert regarding the financial reporting practices in the real estate development industry with respect to the inclusion of contingent liabilities on financial statements. Mid-Continent contended that the Court should decline to qualify Mr. O'Brien as an expert and should exclude his testimony.  See Mid-Continent Casualty Company's Motion in Limine to Exclude the Expert Testimony and Report of Thomas J. O'Brien, and Brief in Support.  (Doc. 36).  After hearing Mr. O'Brien's testimony, and based on the witness's lack of experience in either obtaining or underwriting surety bonds, the Court granted Mid-Continent's Motion.  Thus, the Court has not considered Mr. O'Brien's testimony in reaching its findings and conclusions in this adversary proceeding.

his assets and failed to disclose significant contingent liabilities.  Mid-Continent contended that Markle published these documents with the intent to deceive  Mid-Continent and to induce it to issue the Bonds.  Further, Mid-Continent contended that had it known the actual financial condition of Markle and Parking Builders, it would not have issued the Bonds. Mid-Continent asserted that it reasonably relied on the financial documents to its detriment and that it suffered actual damages in the amount of $820,553.26 as a result of claims it paid. Finally, Mid-Continent asserted that it is entitled to recover the amounts it set aside for reserves and its attorney fees.

Markle admitted that he provided written financial documents to Mid-Continent, but argued that the documents were not materially false.  Markle asserted that based on the standard industry practices at the time he prepared the written financial documents, it was not necessary for him to disclose contingent liabilities on his financial statement.  Further, Markle argued that even if the documents were materially false, he provided them to Mid-Continent in good faith and did not intend to deceive Mid-Continent.  Markle also disputed Mid-Continent's contention that its reliance on the written financial documents was reasonable.  Finally, Markle argued that if his debt is determined to be non-dischargeable, Mid-Continent is not entitled to the full amount of the damages it seeks because Mid-Continent failed to mitigate its damages.

## III.    FINDINGS OF FACT

1.    Mid-Continent is a surety company in the business of providing bonding for
construction and other projects.  (Pretrial Order ("PTO") ¶1).

2.    In April 2004, Markle formed Parking Builders to engage in the construction of
concrete parking structures through the use of precast/prestressed and cast-in-place
concrete.  Markle was a manager of Parking Builders and owned 51% of its stock.
In May 2004, Markle merged two limited liability companies that he had formed in
2003 – General Building Systems, LLC ("GBS") and Enco Concrete, L.L.C. ("Enco")
– into Parking Builders.  Markle was a manager of both companies and owned
31.67% of GBS and 51% of Enco.

3.    In order to bid for or participate in a parking garage construction project in Florida
known as the Veranda Project, Parking Builders was required to obtain performance
and payment bonds. Prior to January 21, 2008, (the "Petition Date") Mid-Continent
issued the Bonds, with Parking Builders as principal.

4.    In order to obtain the Bonds, Markle furnished Mid-Continent a document titled
David G. and Robin T. Markle Statement of Financial Condition December 31, 2004
(the "2004 Financial Statement").  (Ptf. Exh. 1). Markle also furnished a number of
other written statements respecting the financial condition of Markle, Parking
Builders, GBS and Enco.  (PTO ¶¶3, 4, 5).[2]

---

[2] The parties stipulated that the following written financial statements were presented to Mid-Continent:

    (a)    Parking Builders' 2004 Federal Income Tax Return (furnished to Mid-Continent on June 2, 2005) (Ptf. Exh. 29);

    (continued...)

5.      In order to induce Mid-Continent to issue the Bonds, Markle executed the Indemnity

Agreement, whereby Markle and other indemnitors jointly and severally agreed to

indemnify Mid-Continent against any and all liability for losses and expenses,

including attorney fees, which Mid-Continent incurred under the Bonds.  (Ptf. Exh.

2 ¶¶1, 2).

6.      As a part of its underwriting process for issuing the Bonds, Mid-Continent obtained

reports from Dun & Bradstreet, reviewed Parking Builders' accounts receivables,

various tax returns, internal financial statements, work in progress reports and

schedules of contracts.  Mid-Continent also reviewed the financial information and

reports it had previously obtained in connection with a bond it had issued to Parking

Builders for a project in Texas know as the Gaylord Project.  The Gaylord Project was

completed without any unresolved claims and at a profit to Parking Builders.

---

[2](...continued)
(b)      Enco's 2004 Federal Tax Return (furnished to Mid-Continent on June 13, 2005) (Ptf. Exh. 37);
(c)      Enco's 2004 Financial Statement, including a balance sheet for May 7, 2004, a statement of earnings for the period ending May 7, 2004, a statement of cash flows for the period ending May 7, 2004, and the notes to the financial statement for Enco for the period ending May 7, 2004 (Ptf. Exh. 38);
(d)      GBS's 2003 Federal Income Tax Return (furnished to Mid-Continent on July 13, 2005) (Ptf. Exh. 39);
(e)      GBS's 2004 Federal Income Tax Return (furnished to Mid-Continent on July 13, 2005) (Ptf. Exh. 40); and
(f)      GBS's 2004 Financial Statement, including a balance sheet for May 7, 2004, a statement of earnings for the period ending May 7, 2004, a statement of cash flows for the period ending May 7, 2004, and the notes to the financial statement for GBS for the period ending May 7, 2004 (Ptf. Exh. 41).

(PTO ¶¶3, 4, 5).  Due to the conclusions that the Court makes with regard to the 2004 Financial Statement, it is not necessary for the Court to make extensive findings regarding the other written financial statements provided to Mid-Continent.

7.  Todd Bazata, Vice-President of Mid-Continent and Manager of Mid-Continent's surety bond operations, reviewed and approved Markle's request for the Bonds.  Mr. Bazata has 28 years of experience in bond underwriting with Mid-Continent and other surety companies.  Mr. Bazata's testimony that Mid-Continent followed its normal business practices in evaluating the credit-worthiness of Markle and Parking Builders and that such practices were consistent with industry practices was uncontroverted and consistent with the documentary evidence admitted at trial.

8.  Markle intended that Mid-Continent would rely on his 2004 Financial Statement (and the other written financial statements) in determining whether to issue the Bonds for Parking Builders.

9.  Mid-Continent did not issue the Bonds until after it had received the 2004 Financial Statement from Markle in June 2005.  (PTO ¶9).

10. The 2004 Financial Statement showed that Markle had total assets of $4,186,000.00, total liabilities of $276,000.00, and a net worth of $3,910,000.00.  (Ptf. Exh. 1). The 2004 Financial Statement lists seventeen assets.  Mid-Continent presented evidence disputing Markle's values for the following six assets: "Stock in Tulsa Dynaspan, Inc. market value;" "55 Acre Development Land at 10428 E. 121st, Bixby;" "Arlington Homes, Inc.;" "Citadel Residential Group, L.L.C.;" "Cooper Land Co., L.L.C.;" and "Parking Builders, L.L.C."

11. Throughout his testimony, Markle contended that he had valued all of his business interests listed in his 2004 Financial Statement using the following "formula:" the value of the asset minus liabilities associated with the asset, multiplied by Markle's

interest in the asset, plus an adjustment for future profit.  Rather than relying on appraisals, detailed accounting statements and tax returns to determine the value of his interests in the assets, Markle conveniently elected to use a "formula" that allowed him to speculate about future profits associated with his business interests in order to inflate the value of those interests.  In many instances, Markle was not able to explain or recall how he calculated the "adjustment for future profit."  Having considered Markle's demeanor and testimony, the Court is left with the distinct impression that Markle presented a methodology in an attempt to support the values he had placed on his assets in the 2004 Financial Statements, rather than an explanation of the actual method he used in determining those values in 2004. As discussed more fully below, the Court finds that Markle's explanations and valuation methodology were not credible or reliable.

**A.     Stock in Tulsa Dynaspan, Inc. market value.**

12.     Tulsa Dynaspan, Inc. ("TDI") is a provider of products and services in the precast/prestressed and cast-in-place concrete industries.  Markle founded TDI in 1980 and was the sole shareholder until approximately 1986.  In 1986, Markle sold 51% of TDI to The Monarch Cement Company ("Monarch").  From 1986 through 1999, Markle sold additional TDI stock to Monarch and also repurchased some TDI stock from Monarch.

13.     After 2000, Markle attempted to sell his TDI stock without success (PTO ¶12).  TDI stock is not traded on any market (PTO ¶13), and Markle never received any firm offers for his TDI stock.

14.     From 2002 and until the Petition Date, Markle owned 19.87% of TDI, Monarch

        owned 79.85%, and Richard Evilsizer owned .33% of the stock. (Ptf. Exh. 12 p.3).[3]

15.     Markle was the President of TDI until January 11, 2005.

16.     In his 2004 Financial Statement, Markle listed the value of his 19.87% interest in TDI

        as $900,000.00.   Markle testified that this value was the result of his standard

        "formula" for valuing assets.   Markle testified that he had used the book value from

        TDI's 2003 financial statement to value his interest in TDI rather than the book value

        from its 2004 financial statement.   He allegedly used a total asset amount of

        $20,862,123, subtracted  liabilities in the amount of $8,652,373, leaving a net asset

        value of $12,209,750.   This value was multiplied by 20%, his approximate interest in

        TDI, to arrive at $2,441,950.   He stated that he discounted that amount by 60% to

---

[3] The Court notes that these total share percentages add up to 99.96%.   There was no evidence
admitted at trial to account for the remaining 0.04%.

arrive at $900,000.[4]  Markle's explanation of the value of his TDI stock was not credible.[5]

17.   At a time when Markle owned a minority interest in TDI, Marvin Morse, Markle's accountant, had advised Markle regarding the appropriate method Markle should use to value his TDI stock.  Based on Markle's minority interest, the closely-held nature of TDI stock, and the volatility of the industry, Morse advised Markle that the appropriate method for Markle to use to value his stock would be to discount the book value of TDI by 50%.[6]  Mr. Morse's advice, memorialized in a December 20, 1994, letter to Markle, also stated that neither a multiple of earnings nor an asset appraisal method would be appropriate methods of valuing the TDI stock.  (Ptf. Exh. 9).  Mr.

---

[4] When a 60% discount factor is applied to Markle's interest in TDI's 2003 book value, the resulting amount is $976,780.  Markle did not explain why he rounded this number down by $76,780 to arrive at $900,000, the amount he used in his 2004 Financial Statement.

Markle testified that he used a 60% discount because he believed his interest in TDI was negatively impacted by a minority oppression lawsuit he had recently filed against TDI and Monarch.  In other financial statements in which Markle had valued his interest in TDI, Markle used different discount factors to "adjust for future profits."  In an August 2003 financial statement, Markle adjusted TDI's book value by a positive 10% factor. (Def. Exh. 900).  In an April 2004 Statement, he discounted the book value by 20% . (Def. Exh. 901). In a span of 18 months, Markle's valuation of his interest in TDI decreased by $1,740,000 as a result of Markle's adjustments for future profits.

[5] When responding to cross-examination, Markle admitted that he did not recall the basis for the $900,000 valued he had placed on his interest in TDI.  Also, Markle's explanation regarding his use of 2003 book value instead of 2004 book value was not consistent.  Initially, he claimed that he valued his interest in TDI based on TDI's 2003 book value because he did not have access to the 2004 book value when he prepared the 2004 Financial Statement.  He later changed his testimony and admitted had access to the 2004 book value but chose not use it because he thought it was anomalous.

Markle also contended that his valuation was based on a "market value" i.e. the amount he allegedly would have received if TDI had been sold.  Markle admitted there was no market for his stock and that TDI's assets were not being marketed, nor was it likely that a sale of TDI would occur.

[6] Markle disputed the appropriateness of a 50% discount rate on the grounds that the discount factor was a one-time instruction for the sole purpose of minimizing tax consequences.  However, Mr. Morse testified that he based his recommendation on the factors specific to Markle's interest in TDI as described in his letter, not tax considerations.

Morse confirmed that his earlier advice was still appropriate in 2004.  As of December 31, 2004, the book value of TDI was $1,152,080.  (Ptf. Exh. 5, pp.2-3).[7] The book value of Markle's 19.87% interest was $228,918, and when discounted by 50%, results in a value of $114,459.  The Court finds that Markle's valuation of $900,000 greatly overstated the value of his interest in TDI.

**B.     55 Acre Development Land at 10428 E. 121st, Bixby**

18.     The 55 Acre Development Land at 10428 E. 121st, Bixby (the "Farm") was a 55 acre development parcel owned by Markle.  The Farm was appraised by an independent, certified appraiser in March 2004.  According to the appraisal, commissioned by Arvest Bank ("Arvest"), the highest and best use for the Farm was residential development land.  The appraised value of the Farm was $770,000.00, based on the assumption that title to the Farm was marketable and free and clear of any and all liens and encumbrances.   (Ptf. Exh. 13).

19.     Due to the existence of numerous title defects, Markle commenced a quiet title action in the District Court for Tulsa County, Oklahoma in September 2004.  The quiet title suit named 26 defendants, plus John Doe and Jane Doe, and was not resolved until August 2007.[8]  (Ptf. Exh. 14).

20.     As of the date of the 2004 Financial Statement, the Farm was encumbered by a mortgage held by Arvest that secured a note in the original principal amount of

---

[7]  This amount is more than 60% less than the book value in 2003, the value Markle used to value TDI in December 2004.

[8] Notwithstanding the fact that Markle testified that he believed he had clear title to the Farm based on an attorney's title opinion (Def. Exh. 205) and a title insurance policy (Def. Exh. 204), both issued in February 2004, he only obtained a clear title at the conclusion of the quiet title action.

$500,000.  Markle did not disclose his indebtedness to Arvest in the "Liabilities and Net Worth" section of his 2004 Financial Statement.  (PTO ¶19 and Ptf. Exhs. 1, 16, 17).

21.   In his 2004 Financial Statement, Markle listed the value of the Farm as $1,200,000.00.

22.   The Court finds that the value of the Farm in December 2004 did not exceed $770,000.  After reducing the value of the Farm by the amount of the debt Markle owed to Arvest, the value of the Farm did not exceed $270,000.  Markle's explanation for his valuation of the Farm was not persuasive and the Court finds that he overstated the value of the Farm by at least $930,000.[9]

---

[9]  Markle testified that he believed the Farm was worth $1,700,000 and that after deducting his debt to Arvest, the net value of $1,200,000 was appropriate.  Markle testified that he did not agree with the appraised value because the appraisal did not consider the increasing amount of commercial development in the area, did not reflect the price of comparable sales of undeveloped property in the area, and should not have assumed that the property would be used for agricultural purposes.  Markle also attempted to support his 2004 valuation by introducing an appraisal that valued the Farm at $1,800,000 in December 2007 (based on selling 45 development lots at $40,000 each)(Def. Exh. 207) and by the fact that the Trustee of Markle's bankruptcy estate sold the Farm for $1,945,045 in April 2009.  Markle admitted he was not a appraiser and that his valuation included consideration of future profits even though no development had taken place on the Farm at the time of the 2004 Financial Statement.

Upon review of the independent appraisal of the Farm performed in  March 2004 (Ptf. Exh. 13), the Court finds that the appraiser identified that the highest and best use for the Farm was residential development property, not agricultural use, that he used a comparable sales method to determine the market value of the Farm, and included extensive discussion of the residential and commercial development in the area of the Farm and its effect on the value of the land.  Considering those factors, the appraiser determined the value of the land was $770,000.  Due to the remoteness in time of the December 2007 appraisal and April 2009 sale of the Farm, the Court finds that the independent 2004 appraisal to be the most credible evidence of the value of the Farm.

### C.    Arlington Homes, Inc.

23.    Arlington Homes, Inc. ("Arlington") was a residential real estate development project. Markle was the sole shareholder of Arlington.

24.    In April 2003, DGM Ventures, L.L.C. ("DGM"), a company wholly owned by Markle,  purchased undeveloped real estate (the "Arlington Land") to use in the Arlington project for $530,000.  (Ptf. Exh. 18).  DGM borrowed $405,000 from Arvest to purchase the Arlington Land.  This debt was secured by a mortgage on the Arlington Land.  (Ptf. Exh. 19).

25.    Markle obtained a real estate appraisal of the Arlington Land in February 2004, in which the land was valued at $550,000.  (Def. Exh. 612).

26.    In April 2004, the Arlington Land was transferred by DGM to Arlington, but the price was marked up to $1 million, thereby increasing the value of the undeveloped land by $470,000 on Arlington's books.  (Ptf. Exh. 20).  No cash was paid on this transfer. Markle testified that the reason for the markup was to account for future profits.  At the time of the conveyance, the Arlington Land was also encumbered by a mortgage to Arvest that secured a line of credit in the face amount of $1,387,500.  (Ptf. Exh. 21).

27.    Arlington's internal balance sheet for March 31, 2005, reflects negative equity of $14,533.09, the internal balance sheet for June 30, 2005, reflects negative equity of $27,631.71, and Arlington's 2004 federal income tax return for the fiscal year ending June 30, 2005, reflects negative equity of $16,617.00.[10]  (Ptf. Exhs. 24, 25 and 26).

---

[10] Arlington's internal financial statement for March 31, 2005, indicates a year-to-date operating loss (continued...)

28.     As of the date Markle presented the 2004 Financial Statement to Mid-Continent, the

        Arlington land was fully encumbered, Arlington had negative equity and had no

        value.[11]

29.     Markle listed the value of Arlington as $310,000.00 in his 2004 Financial Statement.

        Markle's explanation for his valuation of Arlington was not credible, and he

        overstated the value Arlington by at least $310,000.[12]

        **D.      Citadel Residential Group, L.L.C.**

30.     Citadel Residential Group, L.L.C. ("Citadel") was a residential real estate project in

        Oklahoma and Arkansas.  Markle owned 20% of Citadel as of the date of the 2004

        Financial Statement.

31.     Citadel's 2004 Income Tax Return for the year ending December 31, 2004, indicates

        that the total equity in Citadel was $305,277.  Markle's 2004 Schedule K-1 states that

        Markle's equity account balance was $61,035.  (Def. Exh. 807).  Citadel's internal

---

[10](...continued)
of $15,026.98, the June 30, 2005, financial statement indicates a year-to-date operating loss of $28,105.00, and Arlington's 2004 federal income tax return (fiscal year ending June 30, 2005) indicates a loss of $13,208.00. (Ptf. Exhs. 24, 25, 26).

[11] Arlington's March 2005 balance sheet reflects an outstanding balance on the Arvest line of credit of $1,202,928.63, and its June 2005 balance sheet reflects an outstanding balance of $1,364,398.73.  (Ptf. Exhs. 24, 25).

[12] Markle testified that he had valued Arlington "conservatively" based on his appraisal of the Arlington Land as developed land less the debts on the project plus an adjustment for future profits.  He also testified that he valued Arlington based on its March 30, 2005, financial statements.  (Def. Exh. 604).  These statements show that Arlington had negative equity.  Markle never explained how he had used his "formula" to value Arlington, what the adjustment factor for future profits was, or why it would be appropriate to adjust Arlington's negative net value to the $310,000 value listed in the 2004 Financial Statement.  At the time Markle provided his 2004 Financial Statement to Mid-Continent, development work on Arlington had not been completed, no sales had been made, and no income had been received.  Markle admitted that as of the summer of 2005, the profits he had anticipated had not materialized, and that he gave the Arlington project back to Arvest in 2006.

financial statements indicate that by March 30, 2005, Citadel had negative equity of $30,162.   (Ptf. Exh. 50). The Court finds that the appropriate value of Markle's interest in Citadel was $61,035, the amount reported on his 2004 Schedule K-1.[13]

32.    Markle valued his 20% interest in Citadel in his 2004 Financial Statement at $110,000.00.  The Court finds that Markle's explanation for his valuation of Citadel was not credible and that he overstated the his value in Citadel by at least $48,965.[14]

**E.    Cooper Land Company, L.L.C.**

33.    Cooper Land Company, L.L.C. ("Cooper") was a residential real estate development project.  As of the date of the 2004 Financial Statement, Markle owned a 1/9th interest in Cooper.

34.    In November 2003, Cooper purchased undeveloped land for the Cooper project for $2,907,000.   Cooper simultaneously conveyed a portion of the land, valued at $220,000, to a third-party.  The net purchase price of the remaining project land was $2,687,000. (Ptf. Exhs. 55, 56).  As part of the same transaction, Cooper executed two notes to Oklahoma National Bank & Trust ("ONB") in the original principal amounts of $1,746,472 and $940,408, respectively, or a total of $2,686,880.  This debt was secured by two mortgages against the Cooper land.   (Ptf. Exhs. 57, 58). Although it

---

[13] Markle's partnership capital account balance had declined to $28,337 by the end of 2005.  (Def. Exh. 810).  In 2006, due to his inability to meet a membership cash call, Markle relinquished his 20% interest in Citadel to the remaining members of the company for no consideration.

[14] Markle testified that he valued Citadel based on its net asset value plus an adjustment for future profitability.   There was no testimony regarding the future profitability of Citadel or what factors he considered in determining profitability.  In light of the fact that Citadel's book value was negative in March 2005, Markle's valuation of $110,000 was not credible.

appears that the land was fully encumbered, Markle valued his interest in Cooper at $40,000.

35.     The only financial information that was admitted regarding Cooper was Markle's 2004 and 2005 tax returns.  These returns indicate that Markle reported a passive loss on his interest in Cooper of $14,717 in 2004 and a $7,708 loss in 2005.  (Def. Exhs. 800, 801).

36.     Due to the limited evidence regarding Cooper and its assets, the Court is not able to make any additional findings regarding the value of Markle's interest in Cooper.[15]

### F.     Parking Builders, L.L.C.

37.     Markle and Mid-Continent presented two exhibits that contain financial information relevant for determining Parking Builders' book value in December 2004.  Parking Builders' 2004 Federal Tax Return, which includes a Schedule K-1 for Markle, indicates that Markle's 51% interest in Parking Builders had a book value of $769,068 on December 31, 2004.  (Ptf. Exh. 29).  Parking Builders' December 31, 2004, financial statements indicate that the total book value of the company was $2,442,334. (Def. Exh. 906).  Thus, Markle's 51% interest in Parking Builders would be valued at $1,245,590.  In his 2004 Financial Statement, Markle valued his interest in Parking Builders at $966,000.00.  Markle never offered any credible testimony explaining his valuation of Parking Builders.

---

[15] Markle specifically testified that he did not use his "formula" of net asset value plus an adjustment for future profitability to value Cooper.  He testified that he was a passive investor and that his valuation was based solely on his estimate of Cooper's future profitability.

38.    At the time Markle furnished the 2004 Financial Statement to Mid-Continent, numerous claims were pending against Parking Builders.  In December 2004, Markle commenced litigation in Tulsa County District Court against TDI and Monarch alleging minority oppression and requesting that TDI and Monarch be required to purchase his interest in TDI.  (Ptf. Exhs. 10, 11).  In April 2005, prior to the date that Markle furnished his 2004 Financial Statement to Mid-Continent, TDI filed a Complaint in the United States District Court for the Northern District of Oklahoma against Markle, Parking Builders, GBS, Enco, and others, alleging that each of them, working in concert, had diverted business and customers from TDI, usurped TDI's corporate opportunities, misused TDI's corporate funds, conspired to divert TDI's business to Enco, GBS and Parking Builders, appropriated TDI's trade secrets, and interfered with TDI's business and contractual relations.  TDI sought damages for lost profits and business opportunities, injunctive relief enforcing a non-compete clause against Markle and Parking Builders, and punitive damages.  (Ptf. Exh. 27).  If TDI was successful, Markle's investment in Parking Builders would be valueless, and Parking Builders would have been enjoined from completing the Veranda Project.

39.    Although Markle informed Mid-Continent that he had filed a minority shareholder oppression suit against TDI and that TDI filed a counterclaim regarding the rights to certain intellectual property, Markle could not recall if he had disclosed TDI's allegations that Markle, Parking Builders, Enco, GBS were diverting business and

income from TDI.[16]  If Mid-Continent had been aware of the allegations included in the counterclaims and the Complaint, it would have conducted a further investigation, and if the allegations appeared to be credible, Mid-Continent would not have issued the Bonds.

40. When Markle provided his 2004 Financial Statement to Mid-Continent,  Markle was a member and manager of Parking Builders, GBS and Enco, and was familiar with their business practices and history and was in a position to realize that there was a substantial probability that TDI would succeed in its claims.[17]

---

[16] Mr. Bazata testified that he recalled having been informed of a lawsuit that Markle had filed against TDI, that he was told that the suit was based on Markle's claim of minority shareholder oppression and undervaluation of Markle's TDI investment and that he knew there was a dispute regarding the purchase price of Markle wanted for his TDI stock.  He also testified that he was advised that TDI had filed a suit against Markle over the property rights to a specific concrete forming method called a "flying form."  He testified that Markle told Mid-Continent that the suit was retaliatory in nature and was filed because Markle had filed the minority oppression lawsuit against TDI.  Mr. Bazata was certain that Mid-Continent had never been informed of the any allegations by TDI that involved fraud, theft, or the usurpation of TDI's business opportunities by Markle or Parking Builders.  Markle thought he might have mentioned the suit to Carl Benton, the underwriter at Mid-Continent, but admitted under cross-examination that he was not sure what he had told Mr. Benton or Mr. Bazata.

The Court finds that Markle failed to advise Mid-Continent about the true nature of TDI's claims against Markle and Parking Builders and also failed to disclose the claims or make any adjustments to reflect the potential effect of the claims on the value of his assets in his 2004 Financial Statement.

[17] The claims made by TDI in its Complaint in the United States District for the Northern District of Oklahoma  were substantially similar to its counterclaims filed in Markle's minority oppression lawsuit in Tulsa County District Court, Case No. CJ-2004-07991. The federal case was stayed pending resolution of the state court action.  In the state court action, the state court concluded that Markle, Parking Builders, GBS, and Enco were liable on all of  TDI's claims.  (Ptf. Exh. 30).  Many of the projects that Markle reported to Mid-Continent to establish a successful track record and capacity to perform, and to show a history of profitability for his companies, were projects that GBS, Enco and Parking Builders usurped from TDI.  Id. Parking Builders, GBS and Enco did not have independent records of projects or profitability that would meet Mid-Continent's underwriting requirements.  Additionally, the income and profits reported or claimed by the companies were not the result of traditional business practices, but instead were the proceeds of these companies usurping TDI's opportunities and profits.

In Judgments entered in conjunction with the findings in the state court action (Ptf. Exhs. 31, 32), the state court found Parking Builders liable for over $1,600,000 in actual damages and $1,600,000 in punitive damages.  GBS and Enco were also found to be jointly liable for over $3,000,000 in actual damages

(continued...)

41.     Although it would have been difficult for Markle to determine an appropriate value for Parking Builders, Markle knew, or should have known, that despite a positive book value, the value of Parking Builders was seriously impaired and that his $966,000 valuation substantially overstated the true value of Parking Builders.[18]

### G.     Liabilities and Net Worth

42.     In his 2004 Financial Statement, Markle only listed one debt in the "Liabilities and Net Worth" section:  the debt evidenced by a $276,000 note secured by a mortgage on his residence.  There are no other liabilities listed in that section of his 2004 Financial Statement, notwithstanding the fact that Markle was directly liable on a note to Arvest in the principal amount of $500,000 which was secured by a mortgage on the Farm.  (Plt. Exhs. 1, 16).

43.     Markle did not reflect the following contingent liabilities in the "Liabilities and Net Worth" section of his 2004 Financial Statement:

        a.     Personal Guaranty to Home Bank, $413,275 (Ptf. Exh. 53);

        b.     Personal Guaranty to Home Bank, $90,000 (Ptf. Exh. 52);

---

[17](...continued)
and $3,000,000 in punitive damages for their activities related to TDI.  While the exact value of these damages were unknown at the time Markle furnished Mid-Continent his 2004 Financial Statement, the facts that formed the basis for these damages, and the potential magnitude of the damages, should have been known to Markle as a managing member of these companies.

[18] Even if Markle's interest in Parking Builders was valued at the Schedule K-1 amount of $769,068 and the effect of the pending litigation on the value of Parking Builders was not considered, Markle overvalued this asset by almost $200,000 on his 2004 Financial Statement.  Markle had sufficient information in June 2005, when he furnished his 2004 Financial Statement to Mid-Continent, to recognize that the value of Parking Builders was seriously compromised.

c.   Personal Guaranty to ONB Bank $503,380.75 (including a prior guaranty to ONB of $335,860) (Ptf. Exhs. 60, 61);

d.   Personal Guaranty to Bank of Oklahoma, $62,400 (Ptf. Exh. 54); and

e.   Personal Guaranty to Arvest Bank, $1,387,500 (Ptf. Exh. 22).[19]

**H.   Other Factual Findings**

44.   The total value of Markle's assets on the 2004 Financial Statement is $4,186,000.  At the time Markle furnished the 2004 Financial Statement to Mid-Continent in June 2005, the value of his assets did not exceed $2,111,491 and his net worth did not exceed $1,835,491.  Markle's 2004 Financial Statement overstated the value of his net worth by at least $2,000,000 and indicated a net worth for Markle of more than twice his actual net worth.[20]  The sheer magnitude of this overstatement, together with Markle's inability to provide a credible or consistent explanation or methodology for his valuation leads the Court to conclude that Markle furnished the 2004 Financial

---

[19] A great deal of argument, briefing and testimony focused on the alleged omission of these contingent liabilities.  Mid-Continent argued that Markle's failure to list these contingent liabilities rendered the 2004 Financial Statement materially false and established that Markle had the intent to deceive Mid-Continent.  Markle contended that he considered the guaranties when he valued his assets on the 2004 Financial Statement and that standard practice in the industry at that time was to exclude personal guarantees. Markle contended that his failure to disclosure these contingent liabilities was justified and did not make his 2004 Financial Statement materially false or give rise to any inference of an intent to deceive.

Due to the conclusions the Court makes regarding the 2004 Financial Statement, it is not necessary for the Court to make any findings regarding the whether the omission of these contingent liabilities render the 2004 Financial Statement materially false.

[20] The Court notes that if Parking Builders had no value, then Markle's assets and net worth would have been overstated by more than 300%.

-19-

Statement to Mid-Continent with a reckless disregard for its accuracy or truthfulness.[21]

## I.    Damages

45.    Mid-Continent presented undisputed evidence that it paid $820,553.26 in claims made against the Bonds and that after Markle failed to fund reserves against future losses when requested to do so, Mid-Continent established a reserve, as authorized by the Indemnity Agreement, in the amount of $169,382.10. (Ptf. Exh. 3, as modified by Mid-Continent's Stipulation and Amendments to Plaintiff's Proposed Findings of Fact and Conclusions of Law (Doc. 55)).

To the extent that any of the above enumerated "Findings of Fact" should more appropriately be considered "Conclusions of Law" they are incorporated therein by this reference. Conversely, to the extent that any of the following "Conclusions of Law" should more appropriately be considered "Findings of Fact," they are also incorporated herein by this reference.

## IV.    CONCLUSIONS OF LAW

In order to prevail under Section 523(a)(2)(B) of the Bankruptcy Code, Mid-Continent must establish that Markle used a "statement in writing":

---

[21] As discussed elsewhere in this opinion, Markle repeatedly testified that he had no intent to deceive Mid-Continent when he valued his assets for his 2004 Financial Statement. Markle's reckless disregard for the truth or falsity of his 2004 Financial Statement is sufficient to support an inference of an intent to deceive. Even if the Court were to assume that all of the other asset values that Markle listed on his 2004 Financial Statement had been accurate, Markle's failure to disclose the full contingent impact of TDI's lawsuit on his interest in Parking Builders (the named principal on the Bonds) in June 2005 when he furnished that statement to Mid-Continent would render the statement materially false. This failure to disclose is strong circumstantial evidence of Markle's intent to deceive Mid-Continent. Markle's testimony that he did not recall whether or not he had advised Mid-Continent about the lawsuit that would eventually render his investment in Parking Builders worthless was not credible.

    (1) that was materially false;

    (2) respecting his, or an insiders, financial condition;

    (3) on which Mid-Continent reasonably relied; and

    (4) that Markle caused to be made or published with the intent to deceive.

See Bailey v. Turner (In re Turner), 358 B.R. 422, 425 (Bankr. N.D. Okla. 2006);  Bellco

First Fed. Credit Union v. Kaspar (In re Kaspar), 125 F.3d 1358, 1359 (10th Cir. 1997).  The

Supreme Court has unanimously held "that the standard of proof for the dischargeability

exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard."

Grogan v. Garner, 498 U.S. 279, 291 (1991).

   Because Markle admitted that he gave statements in writing regarding his financial

condition to Mid-Continent to obtain money, property, services or credit, (PTO ¶¶ 2, 3, 4, 5

and 6), the only elements of Section 523(a)(2)(B) that are in dispute are whether the 2004

Financial Statement was materially false, whether Mid-Continent reasonably relied on the

2004 Financial Statement and whether Markle intended to deceive Mid-Continent when he

furnished the 2004 Financial Statement to Mid-Continent.

   **A. Material Falsity**

   A statement in writing is materially false for purposes of Section 523(a)(2)(B) if it

"paints a substantially untruthful picture of a financial condition by misrepresenting

information of the type which would normally affect the decision to grant credit." Jordan v.

Southeast Nat'l Bank (In the Matter of Jordan), 927 F.2d 221, 224 (5th Cir. 1991) (quoting

In re Nance, 70 B.R. 318, 321 (Bankr. N.D. Tex. 1987)) (abrogated in part on other grounds

by Matter of Colston, 991 F.2d 257 (5th Cir. 1993)).  "A key and sometimes determinative

consideration in evaluating the materiality of a false statement is the size of the discrepancy."

Buckeye Ret. Co. v. Kakde (In re Kakde), 382 B.R. 411, 421 (Bankr. S.D. Ohio 2008)

(quotation omitted).  Markle overvalued at least four of the six assets that Mid-Continent disputed on his 2004 Financial Statement.  Markle overvalued TDI by $785,000, the Farm by $930,000, Arlington by $310,000, and Citadel by at least $48,000.  These four assets were overvalued by a total amount of at least $2,000,000, or more than four times their actual value.  Markel presented a substantially untruthful picture of his financial situation, and on that basis alone, the 2004 Financial Statement is materially false.

"Further, in determining whether a false statement is material, a relevant although not dispositive inquiry is whether the lender would have made the loan had he known the debtor's true situation."  Eagle Rock Dev., LLC v. Freeman (In re Freeman), 351 B.R. 398, 401 (Bankr. W.D. La. 2006) (quoting In re Bogstad, 779 F.2d 370, 375 (7th Cir.1985)).  See also Jordan, 927 F.2d at 224.   Mr. Bazata's uncontroverted testimony was that Mid-Continent would not have issued the Bonds to Parking Builders if it had known Markle's actual financial condition.

Based on the facts and evidence before it, the Court concludes that the 2004 Financial Statement was materially false.

### B.      Reasonable Reliance

"In order for a debt to be excepted from discharge under § 523(a)(2)(B), the creditor must first show that it actually relied on the financial statement and, second, that reliance must be reasonable." Rural Ent. of Oklahoma v. Watson (In re Watson), 294 B.R. 198, 2003 WL 21241702 *4 (B.A.P. 10 th Cir.  2003) (citing Field v. Mans, 516 U.S. 59, 68).  Thus, Mid-Continent must establish that it actually relied on the 2004 Financial Statement and the reasonableness of that reliance.

-22-

Markle argued that Mid-Continent did not establish that it actually relied on the 2004 Financial Statement based on Mr. Bazata's testimony that he was not certain whether Mid-Continent would have refused to issue the Bonds if Markle had included his contingent liabilities on the 2004 Financial Statement.  Mr. Bazata stated without equivocation that evaluation of the 2004 Financial Statement and Mr. Markle's net worth was an important factor in Mid-Continent's determination of whether it should issue the Bonds, and that if Mid-Continent had known the actual values of the assets listed on Markle's 2004 Financial Statement, it would not have issued the Bonds.

> [The Tenth Circuit Court of Appeals] has held that § 523(a)(2)(B) does not require that a creditor rely exclusively on the false financial statement. Partial reliance is enough.  Relying in part on In re Liming, [797 F.2d 895 (10th Cir. 1986)], this circuit has explained that a debt is obtained by fraud if the fraud is a substantial factor in the creditor's decision.  Thus, partial reliance on a financial statement is adequate if it is substantial, even if the financial statement is not the most substantial factor.

First Nat'l Bank v. Cribbs (In re Cribbs), WL 1875366 at *3 (10th Cir. 2006) (citations and quotations omitted)(emphasis added).  The fact that Mid-Continent requested and evaluated the 2004 Financial Statement as part of its overall determination of whether to issue the Bonds is sufficient to establish that it actually relied on the 2004 Financial Statement.

The reasonableness of a creditor's reliance under Section 523(a)(2)(B) is judged by an objective standard, i.e., that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances.  See Bank of Commerce v. Smith (In re Smith), 278 B.R. 532, 537 (Bankr. N.D. Okla. 2002); Bailey, 358 B.R. at 426.

-23-

A determination of reasonable reliance requires consideration of three factors:

(1)     the creditor's standard practices;
(2)     the standards or customs of the creditor's industry; and
(3)     the surrounding circumstances existing at the time of the debtor's application for credit.

See Bailey, 358 B.R. at 426.

It was standard industry practice, as well as Mid-Continent's practice, to request and review written statements regarding the financial condition and credit worthiness of a surety (in this case Parking Builders), as well as any principals in the business and any guarantors and indemnitors, when evaluating a bond application.  In order to lower its loss rate, Mid-Continent was generally conservative (when compared to other companies in the industry) when evaluating the character and financial situation of its customers, guarantors and indemnitors. Mr. Bazata's testimony was credible and supports the Court's conclusion that Mid-Continent followed its own and industry standard practices in evaluating Markle's 2004 Financial Statement.

A creditor is not required to assume that a debtor is lying or misrepresenting facts in a financial statement.  See W. Builders of Amarillo, Inc. v. Morrison (In re Morrison), 361 B.R. 107, 123 (Bankr. W.D. Tx. 2007).  Where written statements of financial condition are not obviously false or facially incomplete, and a creditor's reasonable review of the statements does not suggest any falsity or incompleteness, the creditor does not have a duty to further investigate.  See First Commercial Bank v. Robinson (In re Robinson), 192 B.R. 569, 578 (Bankr. N.D.Ala. 1996).  If under a totality of the circumstances, a false financial statement appears to give a complete picture of a debtor's financial condition, a creditor is

-24-

entitled to rely on the statement without verification.  See <u>Union Planters Bank Nat'l Assoc.</u> <u>v. Martin (In re Martin)</u>, 306 B.R. 591, 608 (C.D. Ill. 2004).

It is not the Court's duty to scrutinize Mid-Continents's  business judgment in making normal business decisions, or to review its decisions with perfect hindsight.  See <u>Watson v.</u> <u>Leadership Bank (In re Watson)</u>, 958 F.2d 977, 978 (10th Cir. 1992)(citing <u>First Bank v.</u> <u>Mullet (In re Mullet)</u>, 817 F.2d 677, 681-82 (10th Cir. 1987)).  The 2004 Financial Statement was not facially incomplete and did not have any apparent indicia of fraud or falsity.  The statement showed a substantially complete picture of Markle's financial condition that was not inconsistent with the written financial information previously used by Markle to obtain a bond for Parking Builders from Mid-Continent in connection with a previous project. There was no evidence of anything in the prior dealings between Mid-Continent and Markle and Markle's businesses which should have alerted Mid-Continent that Markle's 2004 Financial Statement was materially false.  Based on the surrounding circumstances at the time Markle furnished the 2004 Financial Statement, there were no "red flags" warning Mid-Continent that it could not reasonably rely on that statement.

The Court concludes that Mid-Continent reasonably relied on the 2004 Financial Statement for the purposes of Section 523(a)(2)(B).

### C.    Intent to deceive

"[D]irect evidence of intent to deceive is rarely available, but instead must be determined from the facts and circumstances of each case."  <u>Ark. Aluminum Alloys, Inc. v.</u> <u>Joyner (In re Joyner)</u>, 132 B.R. 436, 442 (D. Kan. 1991).  Because of this lack of direct

evidence of intent, many courts have adopted a totality of the circumstances test including

whether the defendant showed a reckless disregard for the truth.

> The determination of whether a debtor intended to deceive a creditor by the
> publication of the false financial statement most often must be gleaned from
> a myriad of circumstances. Because of the lack of a 'smoking gun' in this type
> of situation, courts have recognized that this element of section 523(a)(2)(B)
> may be satisfied whenever the debtor either had knowledge of the falsity of the
> statement [or] made the statement with reckless indifference to the truth.

Eagle Rock Dev., LLC v. Freeman (In re Freeman), 351 B.R. 398, 401 (Bankr. W.D. La.

2006).  This analysis was adopted in the Tenth Circuit when the Bankruptcy Appellate Panel

held that "[i]ntent to deceive may be inferred from the totality of the circumstances, including

a reckless disregard for the truth."  First Nat'l Bank v. Cribbs (In re Cribbs), 327 B.R. 668,

673 (B.A.P. 10th Cir. 2005) (citations omitted) aff'd, 2006 WL 1875366 (10th Cir. 2006).

See also Morrison v. W. Builders of Amarillo, Inc. (In re Morrison), 555 F.3d 473, 482 (5th

Cir. 2009) ( "A judge may look at the totality of the circumstances and infer an intent to

deceive when reckless disregard for the truth or falsity of a statement combined with the

sheer magnitude of the resultant misrepresentation may combine to produce such an

inference." (quotations and citations omitted));  Equitable Bank v. Miller (In re Miller), 39

F.3d 301, 305 (11th Cir.1994) ("Reckless disregard for the truth or falsity of a statement

combined with the sheer magnitude of the resultant misrepresentation may combine to

produce the [inference] of intent to deceive." (quotations and citations omitted)).

The only direct evidence of the Markle's "intent" was his repeated testimony that he

never intended to misrepresent his financial situation and that any errors on his 2004

Financial Statement were inadvertent and immaterial.  Unfortunately, "unsupported

assertions of an honest intent will not overcome the natural inferences from the admitted

-26-

facts." Central Nat'l Bank & Trust Co. of Enid v. Liming (In re Liming), 797 F.2d 895, 897 (10th Cir. 1986) (citing 3 L. King Collier on Bankruptcy ¶ 523.09[5][b]).   In an unpublished opinion, the Bankruptcy Appellate Panel for the Tenth Circuit noted that "in making a finding of intent, the demeanor and credibility of the witness plays a very large role." Johnson v. Riebesell (In re Riebesell), 407 B.R. 443,  2009 WL 140976 at *6 (B.A.P. 10th Cir. 2009) (citations omitted).  Markle exhibited a remarkable ability to recall with detail his basis for some decisions, and an almost complete lack of recall on other matters.   The items he could recall were those that supported his position and those he could not recall or explain were those that did not.  Such selective recall severely damaged Markle's credibility.  As noted above, Markle's attempt to use a convenient "formula" to support the valuation of his assets rather than providing a credible analysis based on readily available financial documents also damaged Markle's credibility.  Taking Markle's testimony as a whole, the Court finds that his testimony regarding his intent to deceive was self-serving and simply not persuasive.

Markle overstated the value of at least four of the six assets on which evidence was presented.  The cumulative amount of these overvaluations exceeded $2,000,000, an amount that leads the Court to conclude that Markle showed a reckless disregard for the truth when he presented his 2004 Financial Statement to Mid-Continent.

In addition to Markle's reckless disregard for the truth in connection with the 2004 Financial Statement, other circumstances related to Markle's application for the Bonds also support a conclusion that Markle intended to deceive Mid-Continent.  If Markle had made a full disclosure of the business practices of Parking Builders and its predecessors, the nature

of TDI's claims against Parking Builders, and the potential amount of Parking Builders' liability on those claims, Mid-Continent would not have issued the Bonds.  Markle's failure to disclose the nature of the claims brought by TDI against Parking Builders is strong circumstantial evidence of an intent to deceive.  The Tulsa County District Court concluded that Markle had knowingly been usurping TDI's business and utilizing TDI's assets to build his own companies, for his own benefit.  (Ptf. Exh. 30).  When TDI filed suit against him and his corporations, he knew, or should have known, that there was a significant probability that TDI would be successful.  He also should have realized that disclosure of all of TDI's claims against him and Parking Builders would have caused Mid-Continent to conduct further investigation of the financial viability of Parking Builders and Mid-Continent may have declined to issue the Bonds to Parking Builders.  Markle's failure to disclose either the nature of TDI's claims and the likely effect on the value and future viability of Parking Builders was intentional.

Markle failed to list all of his liabilities on his 2004 Financial Statement.  It was uncontroverted that Markle had direct liability on a $500,000 note to Arvest, secured by a mortgage on the Farm, and that this debt was not disclosed on the 2004 Financial Statement. Markle also failed to list any of the contingent liabilities for which he was potentially liable. These contingent liabilities total almost $2,500,000, an amount in excess of Markle's actual net worth at the time of his 2004 Financial Statement.  Markle's failure to disclose these contingent liabilities supports the Court's conclusion that Markle intended to deceive Mid-Continent.

Based on the totality of these circumstances, as well as Markle's reckless disregard for the truthfulness or accuracy of the 2004 Financial Statement, the Court concludes that Markle intended to deceive Mid-Continent as to his actual financial condition.

### D.    Damages

Markle argued that Mid-Continent failed to mitigate its losses by securing its potential liabilities under the Indemnity Agreement with a mortgage on the Farm.  Markle contended that the Indemnity Agreement authorized Mid-Continent to obtain a lien against the Farm, and that Mid-Continent failed to do so, thereby increasing the damages suffered by Mid-Continent under the Bonds.  The Indemnity Agreement does not impose a duty on Mid-Continent to mitigate its damages.  Even assuming such a duty existed, Mid-Continent had no authority to encumber the Farm.  Paragraph 14 of the Indemnity Agreement provides that "[u]pon the occurrence of and event of default as described in paragraph 5 above, this instrument shall be filed as a Lien against . . . [any real property owned by Markle] . . . ." (Ptf. Exh. 2, p.3).  In another Adversary Proceeding regarding the Indemnity Agreement, this Court concluded that prior to the occurrence of any "event of default" as defined by the Indemnity Agreement, Markle had transferred his legal title and interest in the Farm to a different entity.  Thus, Mid-Continent was not in a position to perfect a lien against Markle's interest in the Farm because Markle did not own the Farm at the time an event of default occurred.  See Doc. 40, "Order Granting in Part and Denying in Part Plaintiff's Motion For Partial Summary Judgment", Malloy v. Mid-Continent (In re Markle), Adv. 08-0109.

Markle is indebted to Mid-Continent in the amount of $820,553.26, the amount it has paid in claims made against the Bonds.  Further debt may be incurred in the event additional

claims are paid by Mid-Continent from the current loss reserve it holds against the Bonds in the amount of $169,382.10. Pursuant to the terms of the Indemnity Agreement, Mid-Continent is authorized to recover its attorney's fees related to the Bonds.

## IV.    CONCLUSION

Because the Court finds by a preponderance of evidence that Markle published the 2004 Financial Statement to Mid-Continent in order to obtain the Bonds, that the 2004 Financial Statement was materially false, that Markle intended the 2004 Financial Statement to deceive Mid-Continent, and that Mid-Continent reasonably relied on the 2004 Financial Statement, judgment should be awarded in favor of Mid-Continent and against the Debtor, David Gene Markle. Indebtedness in the amount of $820,553.26 (the amount paid for claims against the Bonds), any additional amounts that are paid for claims made against the Bonds from the loss reserve of $169,382.10 held by Mid-Continent, together with attorney fees recoverable under the Indemnity Agreement, are exempted from discharge under Section 523(a)(2)(B). See Cohen v. De La Cruz, 523 U.S. 213, 218 (1998). The amount of those additional damages may be determined by a court with jurisdiction over those matters.

A separate judgment consistent with this Memorandum Opinion shall be entered concurrently.

DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE